UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                            :

PAULINA RUEDA,             :
                            :
                 Plaintiff,    :
                            :
         - against -          :
                            :
THE CITY OF NEW YORK,    :
                            :
                 Defendant.    :
                            :
------------------------------------------------------X

11-CV-5248 (VSB)

**MEMORANDUM & OPINION**

Appearances:

Samuel O. Maduegbuna
William W. Cowles
Maduegbuna Cooper, LLP
New York, New York
*Counsel for Plaintiff*

Bruce Rosenbaum
Michael F. Fleming
New York City Law Department
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Paulina Rueda brings this action against Defendant the City of New York (the

"City") asserting claims of unlawful employment retaliation and retaliatory hostile work

environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290e *et seq.*

("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8–101 *et*

*seq.* ("NYCHRL").  Before me is the City's motion for summary judgment on all of Plaintiff's

claims.  Because there are genuine disputes of material facts relating to Plaintiff's retaliation

claims, the City is not entitled to judgment as a matter of law and the City's motion for summary

judgment is DENIED with respect to the First Cause of Action and Second Cause of Action.

With respect to Plaintiff's retaliatory hostile work environment claims, I find that there is no

genuine dispute of material fact and Plaintiff has failed to adduce sufficient evidence supporting

her assertion that the hostile work environment she alleges existed and was causally connected

with her protected activity. Accordingly, the City is entitled to judgment as a matter of law and

its motion for summary judgment is GRANTED with respect to the Third Cause of Action and

Fourth Cause of Action.

## I.    **Background**[1]

Rueda was hired in June 1995 as an employee within the New York City Human

Resources Administration ("HRA"), a City agency. (Pl.'s 56.1 ¶ 1.)[2] At the time she was hired,

Rueda's civil service title was Fraud Investigator I and she was assigned to the Bureau of

Eligibility Verification ("BEV"). (*Id*.) In August 1999, Rueda was transferred from BEV to the

Investigation, Revenue and Enforcement Administration ("IREA"), and was assigned to the

Division of Claims and Collections.[3] (*Id*. ¶ 3.) From the time Rueda was transferred to IREA in

August 1999 until August 2012, Nancy Galarza was the Personnel Officer in charge of IREA's

Personnel Office. (*Id*. ¶ 4.)

Plaintiff was on maternity leave from September 25, 2000 until September 24, 2001. (*Id*.

¶ 5.) The paperwork relating to Rueda's promotion to Fraud Investigator II was not processed

---

[1] The facts in this background section are undisputed unless otherwise noted.

[2] "Pl.'s 56.1" refers to Plaintiff's Local Civil Rule 56.1 Statement in Opposition to Defendant's Motion for
Summary Judgment, dated June 21, 2016. (Doc. 143.) References to individual paragraphs of Plaintiff's 56.1
Statement are to Defendant's statements, Plaintiff's responses, or both. I note that Plaintiff failed to comply with
Rule 4.F of my Individual Rules which states that the "opposing party must reproduce each entry in the moving
party's Rule 56.1 Statement and set out its response directly beneath it." In addition, certain of Plaintiff's responses
do not address Defendant's statement and thus should have been submitted as separately numbered paragraphs.
(*See, e.g.*, Pl.'s 56.1 ¶¶ 47, 61, 82, 84.)

[3] At the time, IREA was called the Office of Revenue Investigation.

while she was on maternity leave—because she was classified as "off payroll" during her maternity leave—and was further delayed when she returned to work following her maternity leave. (*Id*. ¶ 6.) On May 16, 2002, Plaintiff and Carlyle Banks, the Director of the Claims and Collections Division at the time, jointly submitted a memorandum to Galarza requesting that Galarza investigate the apparent delay in processing Rueda's promotion to Fraud Investigator II. (*Id*. ¶ 8.) Galarza's office investigated the allegations contained in the May 16 memorandum and determined that the delay in Rueda's promotion was attributable to a City-wide hiring freeze. (*Id*. ¶ 9.) Rueda notified the HRA Equal Employment Opportunity ("EEO") office "that she faced discrimination on the basis of gender and/or pregnancy and wanted to make a complaint on the basis of pregnancy discrimination." (*Id*. ¶ 10.) On July 10, 2002, Galarza communicated with the HRA EEO representative to discuss whether there was a promotion policy that relates to maternity leave. (*Id*.) However, Galarza claimed that "when she got Rueda's grievance she did not understand that Rueda was complaining that she was being treated differently in the processing of her promotional paperwork because she was on maternity leave." (*Id*.)

On February 20, 2003, Rueda filed a grievance under her collective bargaining agreement claiming that HRA failed to promote her to Fraud Investigator II in a timely fashion ("Rueda's 2003 Grievance"). (*Id*. ¶ 13.) In Rueda's 2003 Grievance, Rueda states that she was "discriminated against because of [her] maternity leave." (*Id*.) Rueda requested retroactive pay and benefits commensurate with the Fraud Investigator II position going back to September 24, 2001, i.e., the date she returned from maternity leave. (*Id*.)

Rueda arbitrated her grievance and the arbitrator issued an expedited award denying, in part, and sustaining, in part, Rueda's 2003 Grievance. (*Id*. ¶ 16.) Specifically, the arbitration award stated that "the grievant shall be paid the difference between the salary she earned as a

Fraud Investigator I and the salary of a Fraud Investigator II for the period May 16, 2002 through October 5, 2002." (*Id*.) The arbitrator determined that Rueda commenced her formal complaint on May 16, 2002, and thus was only entitled to retroactive pay from that date until she was promoted to Fraud Investigator II, on October 5, 2002. (*Id*.)

From March 2004 until early 2006, Rueda served as the Administrative Assistant to Carlyle Banks. (*Id*. ¶ 23.) Banks took medical leave from his position at HRA in early 2006 and subsequently retired. (*Id*. ¶¶ 23, 24.) Joseph Rizzotti replaced Banks initially as acting Director of the Division of Claims and Collections until he was officially promoted to Director in April 2008. (*Id*.) Rueda served as Rizzotti's Administrative Assistant until she was transferred, effective January 2, 2007, to the Medicaid Excess Unit within IREA. (*Id*. ¶ 25.)

From April 2006 until May 2011, Plaintiff was assigned to the Medicaid Excess Unit which was managed by Deputy Assistant Director Yanick Mathieu. (Pl.'s 56.1 ¶ 26.) During her tenure in the Medicaid Excess Unit, Rueda had three different direct supervisors. From April 2006 until November 2008, Plaintiff's supervisor was Greg Fils-Aime. (*Id*.) Nircida Martinez was Plaintiff's direct supervisor from November 2008 until November 2010, (Rueda Dep. Tr. 39:8-11), and from November 2010 until May 2011, Emerita Ortiz was Rueda's direct supervisor, (Pl.'s 56.1 ¶ 64).

At all times relevant to this action, the Recruitment, Selection & Placement Division of the Office of Staff Resources ("OSR") operated hiring pools to fill vacancies within the various program areas of HRA. (Loewenstein Decl. ¶ 6.)[4] At a hiring pool, employees from a program area would conduct interviews of candidates to fill vacancies in that program area. (Pl.'s 56.1

[4] "Loewenstein Decl." refers to the Declaration of Judith F. Loewenstein, dated April 20, 2016, which is annexed as Exhibit B to the Fleming Declaration. (Doc. 136-2.)

¶ 34.)  Selection at a hiring pool was subject to further processing of the candidate's

qualifications for appointment by OSR.  (*Id*.)  To fill vacancies at the Associate Fraud

Investigator I level, OSR personnel held a hiring pool on November 20, 2008 ("November 2008

Hiring Pool").  (*Id*. ¶ 33.)

      Rueda attended the November 2008 Hiring Pool, (*id*. ¶ 37), but she was not selected for

promotion, (*id*. ¶ 50).  Rueda was number thirty-four on the eligible list of candidates that could

be selected for promotion to Associate Fraud Investigator I.  (*Id*. ¶ 32.)  Along with Plaintiff,

eighteen other individuals were not selected for promotion at the November 2008 Hiring Pool.

(*Id*. ¶ 50.)

      Rizzotti interviewed candidates at the November 2008 Hiring Pool; however, Rizzotti did

not interview Rueda.  (*Id*. ¶ 43.)  After the conclusion of the interviews, Alita Matos, the Director

of IREA's Bureau of Fraud Investigation ("BFI"), asked Rizzotti for his opinion of Christopher

Salerno.  (*Id*. ¶ 51.)  Rizzotti stated that Salerno was an "excellent candidate for the position."

(*Id*.)  Following the conversation, Salerno was promoted to Associate Fraud Investigator I.  (Tr.

Salerno Dep. 8:4-25.)[5]

      Audrey Moyd has been employed in IREA since 1993.  (Moyd Decl. ¶ 3.)[6]  From 2006

until 2016, Moyd was the Deputy Assistant Director of Claims & Collections and reported

directly to Rizzotti.  (*Id*. ¶¶ 4, 5.)  In this capacity, Moyd considered employees for promotion

and met with Rizzotti to discuss which employees to recommend for promotion.  (*Id*. ¶ 7.)  Prior

---

[5] "Tr. Salerno Dep." refers to the Transcript of the August 7, 2015 Deposition of Christopher Salerno which is annexed as Exhibit T to the Fleming Declaration.  (Doc. 136-20.)  Rizzotti did not interview Salerno, (Tr. Salerno Dep. 8:13-17); however, Salerno worked in Rizzotti's unit as of November 2008, and Matos knew Rizzotti from working with him years before, (Tr. Rizzotti. Dep. 132:2-15).

[6] "Moyd Decl." refers to the Declaration of Audrey Moyd in Opposition to Defendant's Motion for Summary Judgment, dated June 21, 2016, which is annexed as Exhibit 42 to the Madueguna Declaration.  (Doc. 141-42.)  Attached to Moyd's declaration is an exhibit containing her signed and notarized statement which is dated June 8, 2016, and purports to have been made of her "own free will."  (Moyd Decl. Ex. A.)

to the November 2008 Hiring Pool, Moyd met with Rizzotti in Rizzotti's office and stated that

Rueda should be selected for promotion at the upcoming pool. (*Id*. ¶ 8, Ex. A.) In response,

Rizzotti stated that "Paulina would never be chosen for a promotional supervisor position

because Nancy Galarza would never allow that to happen." (*Id*. Ex. A.) Rizzotti also stated that

"Ms. Galarza had actually told him Paulina will never get anything as long as [Galarza was] the

director of personnel." (*Id*.) Moyd also stated that she realized that "if you angered [] Galarza

you may be passed over for promotions," and that she was "upset and angry at the unfairness of

the hiring and promotional system" in IREA, to which Rizzotti stated "his hand[s] were tied and

[he] could do nothing." (*Id*.)

On May 4, 2009, Rueda filed a charge of discrimination with the United States Equal

Employment Opportunity Commission ("EEOC"), in which she alleged that Galarza and Rizzotti

"exercise[d] their influence and abused their authority" in connection with the November 2008

Hiring Pool in retaliation for Rueda's 2003 Grievance. (Pl.'s 56.1 ¶ 60; *see generally* EEOC

Charge.)[7]

From June until September 2011, Plaintiff worked in the Cash Assistance Unit under the

supervision of Bolanle Adeosun. (Pl.'s 56.1 ¶ 85.) During her time in the Cash Assistance Unit,

Rueda frequently reiterated her belief that she was being subjected to a hostile work

environment. (*See, e.g.*, Rueda's July 18, 2011 Ltr. to Sherman 1 ("I am currently working in a

hostile work environment under Ms. Bolanle Adeosun's supervision.")). On September 23,

2011, Plaintiff began a two month medical leave from IREA. (Pl.'s 56.1 ¶ 112.) While Plaintiff

was on leave, Rizzotti "arranged for Ortiz to be transferred to the Cash Assistance Unit to serve

---

[7] "EEOC Charge" refers to Rueda's Charge of Discrimination, dated May 4, 2009, which is annexed as Exhibit 50 to the Madueguna Declaration. (Doc. 141-50.)

as Plaintiff's supervisor upon her return." (*Id.* ¶ 113.) Ortiz was Plaintiff's supervisor in the Cash Assistance Unit from November 2011 until October 2012. (*Id.* ¶¶ 113, 131.)

Rueda was transferred into the Fair Hearing Unit as of October 10, 2012. (Pl.'s 56.1 ¶ 131.) Rosyln Lewis was the Director of the Fair Hearing Unit, and Plaintiff's direct supervisor was Deputy Assistant Director Betzaida Echevarria. (*Id.* ¶ 132.) On December 18, 2012, Rueda states that "Echevarria, in an attempt to intimidate Plaintiff, told Rueda that she had been friends with Galarza for over twenty years, lived one block from Galarza, and had known and worked with Rizzotti for several years." (*Id.* ¶ 135).

Tomika Paisley, an employee in the Fair Hearing Unit, and Echevarria had a conversation in April 2013 regarding Rueda. (Paisley Dep. Tr. 31:9-32:3.) Echevarria had "just" received Rueda's request for additional training regarding her caseload. (*Id.*) Echevarria "was very upset about what was going on, and she stated that she was going to get Paulina [Rueda] for making her look bad." (*Id.*) Paisley and Echevarria had another conversation about Rueda in May 2013 regarding a separate dispute between Echevarria and Rueda. Paisley did not know the substance of the underlying dispute, but Echevarria was "very upset" and stated "I'm going to get her. I know she is a troublemaker. I called to her previous area, and I found out that she's a troublemaker and that she's on probation, so she should look out." (*Id.* 33:7-22.)

## II. __Procedural History__

Rueda proceeding pro se initiated this action by filing her complaint on July 15, 2011. (Doc. 2.)[8] Rueda amended her complaint three times. (Docs. 25, 33, 119.) Rueda's counsel filed notices of appearance in February 2015. (Docs. 88, 89.) In a Memorandum & Order I granted Plaintiff leave to file a third amended complaint, "clarifying her allegations, adding

---

[8] The case was originally assigned to Judge John G. Koeltl and was reassigned to me on January 31, 2014.

allegations related to conduct occurring after she filed her [Second Amended Complaint], and adding retaliation and retaliatory hostile work environment claims under Title VII, the NYSHRL and the NYCHRL," but denied Plaintiff's request to join additional defendants. (Doc. 115.) Plaintiff thereafter filed her Third Amended Complaint on December 16, 2015, (Doc. 119), after discovery was substantially completed. The City filed its Answer to the Third Amended Complaint on January 13, 2016. (Doc. 122.)

On February 2, 2016, the City submitted a pre-motion letter regarding its anticipated motion for summary judgment, (Doc. 125), and Plaintiff submitted her response letter on February 5, (Doc. 126). On February 11, I held a pre-motion conference and granted the City leave to file its motion for summary judgment. On April 22, 2016, the City submitted Defendant's Motion for Summary Judgment, (Doc. 133), Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts, (Doc. 134), the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, (Doc. 135), and the Declaration of Michael F. Fleming in Support of the Motion for Summary Judgment, with exhibits, (Doc. 136). On June 21, Rueda submitted Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, (Doc. 142), Plaintiff's Local Civil Rule 56.1 Statement in Opposition to Defendant's Motion for Summary Judgment, (Doc. 143), and the Declaration of Samuel O. Maduegbuna in Opposition to the Motion for Summary Judgment, with exhibits, (Doc. 141). On July 25, the City submitted its Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment. (Doc. 146.)

### III. <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).

"[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence

in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Moreover, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence . . . ." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV. <u>Discussion</u>

### A. *Statute of Limitations*

The parties agree that Rueda's retaliation claims are limited by the applicable statute of limitations. (Pl.'s Opp. 6; Def.'s Mem. 4–5 .) Accordingly, Rueda's Title VII retaliation claims are time-barred to the extent they accrued prior to July 8, 2008, and Rueda's City and State retaliation claims are time-barred to the extent they accrued prior to July 15, 2008. Because Rueda's retaliatory hostile work environment claims fail, (*see infra* Sections IV.F-G), even if I consider all the incidents supporting those claims, including incidents that would be time-barred

but for the application of the continuing violation doctrine, I need not decide whether the continuing violation doctrine applies here.

## B.    *Evidentiary Issue*

The City objects to the Moyd Declaration on the basis that it contains inadmissible hearsay, but the City does not dispute that, if admitted, the Moyd Declaration would provide direct evidence to substantiate Plaintiff's retaliation claims.  (Reply 6–8.)  With respect to admissibility, Rueda concedes that the Moyd Declaration contains double hearsay, but she asserts that it is admissible pursuant to the so called party-opponent exception set forth at Federal Rule of Evidence 801(d)(2)(D) ("Rule 801(d)(2)(D)").  (*Id*. at 10.)  In response, the City argues that Rule 801(d)(2)(D) does not apply to either level of the statements and thus they are inadmissible hearsay and cannot be considered in deciding the City's motion for summary judgment.  (Reply 6–8.)

### 1.    **Applicable Law**

In deciding a motion for summary judgment, I only consider evidence that could be admissible at trial.  Fed. R. Civ. P. 56(c)(2).  Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  Under Rule 801(d)(2)(D), a statement of an out-of-court declarant is not hearsay and is admissible against a party-opponent if the statement was "made by the party's agent or employee within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  To fall within the party-opponent exception, the "declarant need not be the 'final decisionmaker' on employment matters for his statement on those matters to be deemed within the scope of his agency.  Rather, he need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement."  *United*

*States v. Rioux*, 97 F.3d 648, 661 (2d Cir. 1996).

In June 2016, the Second Circuit addressed whether certain statements made by a defendant's employee fell "within the scope of [the agency] relationship" such that they were not hearsay pursuant to the party-opponent exception. *Walsh v. N.Y.C. Housing Auth.*, 828 F.3d 70, 79 (2d Cir. 2016). In *Walsh*, defendant New York City Housing Authority ("NYCHA") interviewed Walsh, the plaintiff, and five other individuals as candidates to fill five open bricklayer positions. *Id*. at 73. "NYCHA human resources representative Osagie Akugbe oversaw the interview process. Akugbe explained the process to the candidates when they first arrived. He informed them that one candidate would not be hired, and that after the interviews he would tell them who had been selected." *Id*. In addition, Akugbe sat in on each interview, but "had no input in the hiring decisions." *Id*. Walsh was the only female candidate NYCHA interviewed and the only candidate not selected for a bricklayer position. *Id*. at 74. After the interviews concluded, Akugbe took Walsh aside and allegedly relayed to her that she did not get the job because "the interviewers wanted somebody stronger." *Id*. Walsh filed a lawsuit asserting sex discrimination in violation of Title VII, NYSHRL, and NYCHRL. *Id*. at 72–73. In support of her claims, Walsh pointed to Akugbe's statement as direct evidence that NYCHA's decision not to hire her was motivated by sex. *Id*.

The district court granted NYCHA's motion for summary judgment as to Walsh's Title VII and NYSHRL claims and dismissed Walsh's NYCHRL claim without prejudice after declining to exercise supplemental jurisdiction over it. *Id*. at 74. In its decision, the district court sua sponte determined that Walsh's testimony relaying Akugbe's statement consisted of inadmissible hearsay. *Id*. at 79. The district court "emphasized Akugbe's lack of decisionmaking authority" as the basis for why the statements do not fall within party-opponent

exception of Rule 801(d)(2)(D).  *Id*.  On appeal, the Second Circuit vacated the district court's

decision and held, *inter alia*, that Walsh's testimony setting forth Akugbe's statement was not

hearsay pursuant to the party-opponent exception.  *Id*. at 79–80.  The Second Circuit held that

"decisionmaking authority . . . is not required for Akugbe to be considered an agent of NYCHA.

Instead, the declarant 'need only be an advisor or other significant participant in the decision-

making process that is the subject matter of the statement' for the statement 'to be deemed within

the scope of his agency.'"  *Id*. at 79 (quoting *Rioux*, 97 F.3d at 661).  The Second Circuit found

that Akugbe was such an advisor or participant in the decision-making process that was the

subject matter of the statement and vacated the district court's decision.  *Id*.

## 2. Application

Here, Moyd's account of Rizzotti's alleged statements contain two layers:  (i) Galarza's

statement to Rizzotti; and (ii) Rizzotti's statement to Moyd.  Each layer must be considered

separately to determine whether it is admissible.  *See* Fed. R. Evid. 805 ("Hearsay included

within hearsay is not excluded under the hearsay rule if each part of the combined statements

conforms with an exception to the hearsay rules provided in these rules.").

The parties do not dispute that, at the time of the alleged statements, Rizzotti and Galarza

were employed by the City and exercised supervisory authority on behalf of the City over Rueda.

(Pl.'s 56.1 ¶¶ 4, 24, 35, 41.)  Therefore, whether the statements contained in the Moyd

Declaration fall within Rule 801(d)(2)(D) hinges on whether the statements "relate[ ] to a matter

within the scope of the agency."  *Walsh*, 828 F.3d at 79.

The City argues that the first layer—Galarza's alleged statement to Rizzotti[9]—does not

_____

[9] Galarza allegedly said to Rizzotti that Rueda would never be promoted as long as Galarza was the Director of
Personnel at IREA.  (Moyd Decl. ¶ 9.)

fall within Rule 801(d)(2)(D) because Galarza was "not involved in a significant way in the hiring decisions" at the November 2008 Hiring Pool. (Reply 8.) Galarza testified that she was present during the November 2008 Hiring Pool, and her role there was to supervise her staff and generally ensure the process ran smoothly. (Pl.'s 56.1 ¶¶ 35, 36.) In addition, Galarza was close enough to observe certain of the interviews, (Tr. Paisley Dep. 10:5–20);[10] however, she does not recall, one way or the other, whether she was involved in the decision to select or reject any particular candidate, (Pl.'s 56.1 ¶¶ 35, 36). Thus, Galarza's role at the November 2008 Hiring Pool (as far as she can recall) is analogous to Akugbe's role in *Walsh* in that both Galarza and Akugbe were present to observe interviews, provided logistical support, and supervised the process, but were not involved in the hiring decisions.[11] *See Walsh*, 828 F.3d at 73. Accordingly, consistent with *Walsh*, Galarza acted as an "advisor or other significant participant" with respect to the November 2008 Hiring Pool. *Id.* The City does not dispute that Galarza's alleged statement to Rizzotti relates to the decision at issue—Rueda's non-selection at the 2008 Hiring Pool, and thus Galarza's alleged statement falls within Rule 801(d)(2)(D). Thus, the first layer is not hearsay pursuant to Rule 801(d)(2)(D).

With respect to the second layer—Rizzotti's statement to Moyd[12]—the City argues that these statements do not fall within Rule 801(d)(2)(D) because "Mr. Rizzotti did not interview Plaintiff at the November 2008 Hiring Pool . . . and Mr. Rizzotti had no control over whom he

---

[10] "Tr. Paisley Dep." refers to the transcript of the August 7, 2015 deposition of Tomica Paisley which is annexed as Exhibit 11 to the Madueguna Declaration. (Doc. 141-11.)

[11] One distinguishing fact is that Akugbe was a human resources representative without authority whereas Galarza possessed significant authority as the "head of IREA personnel." (Tr. Paisley Dep. 9:24-10:2.)

[12] Rizzotti allegedly said to Moyd that Rueda "would never be chosen for a promotional supervisor position because Nancy Galarza would never allow that to happen and that Ms. Galarza had actually told him [Rueda] will never get anything as long as she is the director of personnel." (Moyd Decl. Ex. A.) In addition, after Moyd expressed her displeasure with this, Rizzotti allegedly replied that "his hand[s] were tied and [he] could do nothing." (*Id.*)

did interview." (Reply 7.)[13]  As the Second Circuit explained in *Walsh*, however, for a declarant's statement to relate to a matter within the scope of his agency relationship, the declarant need only be an "advisor or other significant participant" regarding the decision at issue.  *Walsh*, 828 F.3d at 79.

With respect to his role at the November 2008 Hiring Pool, Rizzotti stated that he interviewed some of the candidates but not all the candidates and thus did not "have the final say in the candidates that [were] ultimately promoted" but he did "make a recommendations [*sic*] as to which candidates['] experience and qualifications [made] them the best fit for the position available." (Rizzotti Aff. ¶¶ 6, 8.)[14]  In addition, it is undisputed that Matos approached Rizzotti after the interviews were completed and asked him for his opinion of Salerno because Matos was considering Salerno for the Associate Fraud Investigator I position in her unit.  (Pl.'s 56.1 ¶ 51.) Although Rizzotti did not interview Salerno in connection with the November 2008 Hiring Pool, (Tr. Salerno Dep. 8:13-17), he stated that Salerno was an "excellent candidate for the position," (Pl.'s 56.1 ¶ 51).  Following the conversation, Salerno was promoted to Associate Fraud Investigator I.  (Tr. Salerno Dep. 8:4-25.)  Thus, Rizzotti acted as an "advisor or other significant participant," *Walsh*, 828 F.3d at 79, in general with regard to the November 2008 Hiring Pool and specifically with regard to the decision whether to select Salerno for the Associate Fraud Investigator I position.  It is also undisputed that Rueda interviewed for and was not selected for the position that was awarded to Salerno.  (Pl.'s 56.1 ¶ 51.)  Accordingly, Rizzotti was an advisor in the decision-making process at issue in his statements to Moyd even if Rizzotti did not

---

[13] The City also asserts that the statements do not fall within the party-opponent exception because Moyd "was not Plaintiff's supervisor, nor was she in Plaintiff's chain of command", (Reply 7); however, Moyd's position is irrelevant because, in determining whether statements fall within Rule 801(d)(2)(D), I look to the agency relationship of the out of court declarant, not the person recounting or relaying the statements.

[14] "Rizzotti Aff." refers to the Affidavit of Joseph Rizzotti, dated July 28, 2009, which is annexed as Exhibit 20 to the Madueguna Declaration.  (Doc. 141-20.)

himself interview Rueda.  *Walsh*, 828 F.3d at 79 (emphasizing that "the declarant 'need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement' for the statement 'to be deemed within the scope of his agency'" (quoting *Rioux*, 97 F.3d at 661)).  Therefore, the alleged statements from Rizzotti to Moyd are not hearsay pursuant to Rule 801(d)(2)(D).

### C.    *Rueda's Title VII and NYSHRL Retaliation Claims*

#### 1.    **Applicable Law**

To sustain her Title VII and NYSHRL retaliation claims, Rueda must demonstrate that she (1) "participated in a protected activity," (2) "suffered an adverse employment action," and (3) "that there was a causal connection between her engaging in the protected activity and the adverse employment action."  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  Courts generally apply the familiar *McDonnell Douglas* burden-shifting analysis to Title VII and NYSHRL retaliation claims, whereby a plaintiff must first make out a prima facie case and the burden then shifts to the defendant to come forward with a legitimate business justification for the challenged practice.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *see Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [plaintiff's] state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York [State] Human Rights Law.").

The *McDonnell Douglas* test is intended to ensure that the "plaintiff has his day in court despite the unavailability of direct evidence."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (citation omitted).  Where there is no available direct evidence, "a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the

protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citation and internal quotation marks omitted).

### 2.    Application

The City concedes that Rueda has demonstrated the first and second elements of her prima facie retaliation case.  (*See* Pl.'s Opp. 6 (acknowledging that Rueda's 2009 EEOC charge and 2003 out of title grievance are instances of protected activity), 8 ("Defendant concedes that Plaintiff's non-selection for promotion in November 2008 and the service of disciplinary charges in April 2014 . . . satisfy the second prong.").)[15]  Accordingly, the dispute lies in whether or not Rueda has demonstrated the third element, i.e., that there exists a causal connection between her protected activity and the adverse employment actions.

With respect to her claims relating to Galarza and Rizzotti, Rueda asserts there is ample evidence demonstrating the requisite causal connection.  (*See* Pl.'s Opp. 16–21.)  Rueda avers that the Moyd Declaration consists of evidence "that Defendant cannot explain away."  (*Id*. at 19.)  Specifically, Rueda points to the statements contained in the Moyd Declaration that Rueda would never be promoted "as long as [Galarza] [was] the director of personnel" because "if you angered [] Galarza you may be passed over for promotions."  (Moyd Decl. Ex. A.)  In addition, Rueda points to (i) Galarza's involvement with investigating the delay in processing Plaintiff's promotion to Fraud Investigator II, (Pl.'s 56.1 ¶ 8), (ii) communications between Galarza and the HRA EEO officer on July 10, 2002 to discuss whether there was a promotion policy that relates

---

[15] In addition, Plaintiff argues that she engaged in additional protected activity and suffered additional adverse employment acts.  (Pl.'s Opp. 8-9 (citing Pl.'s 56.1 ¶¶ 138-143).)  Assuming, without deciding, that the enumerated acts constitute protected activity, Plaintiff's retaliation claims nevertheless fail except those relating to Rizzotti and/or Galarza because, as set forth below, Plaintiff failed to adduce evidence demonstrating a causal connection between the other purportedly protected activity and an adverse employment action.

to maternity leave, (*id*. ¶ 10); and (iii) Galarza's purported failure thereafter to assist Rueda to obtain back pay after Rueda had claimed discrimination, (*id*. ¶ 14). This evidence supports a causal connection between Plaintiff's protected activity and the adverse employment acts attributable to Galarza and Rizzotti, including Galarza's failure to assist Plaintiff to obtain back pay, the failure to promote Rueda after the November 2008 Hiring Pool, the transfer to the Cash Assistance Unit, and the lowered performance evaluation in 2011.[16] Thus, Plaintiff has fulfilled her "light" burden in demonstrating a prima facie retaliation case relating to Galarza and Rizzotti. *See Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001).

With respect to Echevarria, Rueda avers that Echevarria's retaliatory animus can be inferred from the close proximity between Rueda's transfer into the Fair Hearing Unit and Echevarria's initial adverse act. (Pl.'s Opp. 16–17.) This assertion fails for at least four reasons.

First, to establish a causal connection on the basis of temporal proximity, the adverse action must be "very close" in time to the protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted). The Second Circuit has not established a "bright line to define the outer limits beyond which a temporal relationship is too attenuated." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). However, the passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line. *Compare Quinn v. Green Tree Credit Corporation*, 159 F.3d 759, 769 (2d Cir. 1998), *abrogated in part on other grounds* (finding discharge following less than two months after filing a complaint was sufficient evidence of a causal connection to preclude summary judgment) *and Lamberson v. Six West Retail Acquisition, Inc.,* 122 F. Supp. 2d 502, 512 (S.D.N.Y. 2000)

---

[16] The statements in the Moyd Declaration relate directly to the issue of Galarza's promotion and support the circumstantial evidence demonstrating Galarza's retaliatory animus. Thus, Plaintiff is not relying solely on a temporal nexus between her protected activity and the adverse acts attributable to Galarza and Rizzotti, unlike the solely circumstantial evidence relating to Echevarria.

(finding employee fired two months after making complaints was a sufficiently close temporal proximity to infer a causal connection), *with Hussein v. Hotel Employees & Restaurant Union, Local 6,* 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000), *vacated on other grounds*, 14 F. App'x 39 (2d Cir. 2001) ("The passage of more than two months defeats any retaliatory nexus.") *and Ponticelli v. Zurich Am. Ins. Grp.,* 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (noting that two-and-a-half months is "hardly the close proximity of time contemplated . . . for allowing a plaintiff to establish the 'causal connection' element of retaliation claim"); *see also Breeden*, 532 U.S. at 273 (citing with approval cases holding three and four month gaps between protected activity and adverse action to be insufficient to establish causal connection). Here, over nine years separate the filing of Rueda's grievance on February 20, 2003 and the adverse acts attributable to Echevarria beginning on December 18, 2012. (*See* Pl.'s 56.1 ¶¶ 13, 133–35.)

Second, the "first opportunity to retaliate" theory only applies where "the adverse action occurred at the first actual opportunity to retaliate." *Summa*, 708 F.3d at 128. Echevarria knew that Rueda was transferred into the Fair Hearing Unit as of October 10, 2012. (Pl.'s 56.1 ¶¶ 131, 136.) However, Echevarria's first alleged adverse act did not occur until December 18, 2012, when "Echevarria, in an attempt to intimidate Plaintiff, told Rueda that she had been friends with Galarza for over twenty years, lived one block from Galarza, and had known and worked with Rizzotti for several years," (*id.* ¶ 135). Even assuming this qualifies as an adverse act—a dubious claim at best, *see Torres v. Pisano,* 116 F.3d 625, 639–40 (2d Cir. 1997) (plaintiff's allegations that she was "frightened" or "intimidated" are not sufficient to show that she suffered "a materially adverse change in the terms and conditions of employment" (citation omitted))—it nevertheless fails. Echevarria made the comment to Rueda after Rueda had been in the Fair Hearing Unit for over two months, which is beyond the outer limit of what typically creates a

temporal nexus between the adverse act and the protected activity. Moreover, the other purported adverse acts Echevarria took against Rueda, (*see* Pl.'s 56.1 ¶¶ 139, 140–43), all occurred at least three or more months after Rueda's transfer to the Fair Hearing Unit. Accordingly, Echevarria did not retaliate at her first actual opportunity and therefore the theory does not apply here.

Third, Rueda fails to identify any evidence in the record supporting her assertion that Echevarria retaliated against her on account of Rueda's protected activity or Galarza's decade old grudge. Rueda merely points to the fact that Galarza and Echevarria live in the same neighborhood, go to the same church, and occasionally see each other outside of work. (Pl.'s 56.1 ¶ 133.) Based on these facts, no reasonable juror could conclude that Echevarria retaliated against Rueda to exact revenge on behalf of Galarza for her protected activity.

Fourth, the evidence in the record suggests that Echevarria was motivated to retaliate against Rueda for reasons unrelated to Galarza and unrelated to Rueda's protected activity. (Pl.'s 56.1 ¶ 141 (citing Paisley Dep. Tr. 31:9–33:22).) Paisley testified that she and Echevarria had two separate conversations about how angry Echevarria was with Rueda. (*Id*.) Echevarria stated that Rueda "should look out" because she was "going to get [Rueda] for making her look bad." (*Id*.) In addition, Echevarria stated that she "called to [Rueda's] previous area, and . . . found out that [Rueda is] a troublemaker." (*Id*. 33:7–22.) These statements undercut Rueda's assertion that Echevarria was retaliating against her on behalf of Galarza for her protected activity as it is clear from these comments that Echevarria had her own axe to grind concerning Rueda.

Because Rueda fails to demonstrate a causal connection between her protected activity and Echevarria's adverse acts, Rueada has failed to demonstrate a prima facie retaliation case under Title VII or NYSHRL relating to adverse acts attributable to Echevarria. Accordingly, the

City's motion for summary judgment is granted with respect to Rueda's Title VII and NYSHRL retaliation claims relating to adverse acts attributable to Echevarria.[17]

In light of the fact that Plaintiff has demonstrated a prima facie case of retaliation relating to Galarza and Rizzotti, I move to the next step of the *McDonnell Douglas* burden-shifting framework with respect to the adverse acts attributable to Galarza and Rizzotti. Demonstrating a prima facie case "creates a 'presumption of retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.' If the defendant provides such an explanation, 'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action." *Ya-Chen Chen*, 805 F.3d at 70 (citations omitted).

Defendant does not even attempt to offer a non-retaliatory reason for Galarza's failure to assist Plaintiff to obtain back pay and the failure to promote Plaintiff in connection with the November 2008 Hiring Pool. (*See* Def.'s Mem. 17–19.) However, with respect to the other adverse acts attributable to Rizzotti or Galarza, i.e., the transfer to the Cash Assistance Unit and the lowered performance evaluation in 2011, I find that Defendant has offered a legitimate non-retaliatory reason and Plaintiff has not demonstrated that retaliation was the but-for cause of these acts. First, with respect to Rueda's transfer to the Cash Assistance Unit, it is undisputed that such transfers were common practice, (Pl.'s 56.1 ¶ 80), and following Rueda's complaint, this particular transfer was investigated and approved by the Executive Deputy Commissioner in IREA, (*id.* ¶¶ 88–89). Rueda concedes that this fact is "troubling," (Pl.'s Opp. 22), but fails to counter it or identify evidence that the desire to retaliate was the but-for cause for the transfer.

---

[17] Likewise, Rueda has not put forth any direct or indirect evidence to support a prima facie retaliation claim that Mathieu, Russell, Adeosun, Sherman, Harlow, or Lewis held any retaliatory animus towards Rueda for any protected activity. (Reply 5.)

Moreover, while Plaintiff was on leave, Rizzotti "arranged for Ortiz to be transferred to the Cash Assistance Unit to serve as Plaintiff's supervisor upon her return." (*Id.* ¶ 113.) This fact is inconsistent with Plaintiff's claim that her transfer was an act of retaliation. Second, Defendant also provides a legitimate, non-retaliatory reason for the lowering of Rueda's performance evaluation in 2011, namely that the higher rating of "Outstanding" was unsupported. Specifically, Mathieu requested that Ortiz either justify why she gave Rueda an "Outstanding" rating or lower the rating to "Very Good." (Pl.'s 56.1 ¶¶ 122–24.) When Ortiz could not justify the "Outstanding" rating to Mathieu's satisfaction, Mathieu directed Ortiz to lower the rating; however, Ortiz refused to do so. (*Id.*) As a result, Rueda did not receive an official rating for that performance period in 2011. (*Id.*) In light of the lack of evidence demonstrating Mathieu's retaliatory animus towards Rueda and the legitimate, non-retaliatory reason for Mathieu's actions, (*see* Def.'s Mem. 18–19), Rueda has failed to demonstrate that a desire to retaliate was the but-for cause of the request to lower her performance evaluation in 2011.

Accordingly, Defendant's motion for summary judgment is granted with respect to Plaintiff's Title VII and NYSHRL causes of action except is denied solely with respect to the claim of retaliation relating to Galarza's failure to assist Rueda with her back pay claim and the failure to promote Rueda at the November 2008 Hiring Pool.

### D. Rueda's NYCHRL Retaliation Claim

"[F]or many years, the NYCHRL was construed 'to be coextensive with its federal and state counterparts.'" *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015) (per curiam) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d Cir. 2013)). In 2005, however, the New York City Council amended the law to emphasize that "interpretations of state and federal civil rights statutes can serve only as a floor below which the

[NYCHRL] cannot fall" and that the NYCHRL should "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Mihalik*, 715 F.3d at 109 (quoting Local Civil Rights Restoration Act of 2005, § 7, N.Y.C. Local L. No. 85). Accordingly, under the NYCHRL, "any non-trivial discriminatory act is actionable," *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 172 (S.D.N.Y. 2011), however "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives," *Mihalik*, 715 F.3d at 113; *see Weber v. City of N.Y.*, 973 F. Supp. 2d 227, 273 (E.D.N.Y. 2013) (collecting cases and emphasizing that a "plaintiff must still establish that there was a causal connection between her protected activity and the employer's subsequent action").

It cannot be said that retaliatory motives played no part in the adverse acts attributable to Galarza and Rizzotti. (*See* Moyd Declaration; Pl.'s 56.1 ¶ 79.) In light of the "more expansive standard of the NYCHRL," *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 n.3 (2d Cir. 2013), the City's motion for summary judgment on Rueda's NYCHRL retaliation claims is denied to the extent those claims are premised on the same conduct underlying her Title VII and NYSHRL retaliation claims attributable to Galarza and Rizzotti.

I granted the City's motion for summary judgment as to Rueda's Title VII and NYSHRL retaliation claims relating to adverse acts attributable to Echevarria because Rueda failed to offer any evidence demonstrating a causal connection between her protected activity and the adverse acts attributable to Echevarria.[18] Even under the "more expansive standard of the NYCHRL," *Zann Kwan*, 737 F.3d at 843 n.3, I find that no reasonable juror could conclude, based on the evidence in the record, that Rueda's protected activity played any part in the alleged adverse acts attributable to Echevarria. Accordingly, the City's motion for summary judgment on Rueda's

---

[18] *See supra*, footnote 16.

NYCHRL retaliation claims is granted to the extent those claims are premised on the same

conduct underlying her Title VII and NYSHRL retaliation claims attributable to Echevarria.

### E. Rueda's Title VII and NYSHRL Retaliatory Hostile Work Environment Claims

The City also moves for summary judgment on Rueda's Title VII and NYSHRL

retaliatory hostile work environment claims. These claims fail for several reasons described

below, including Rueda's acknowledgement that the allegedly hostile work environments in the

Cash Assistance Unit and Fair Housing Unit were not causally connected with her protected

activity and also because the incidents were not sufficiently severe or pervasive. Accordingly,

the City's motion for summary judgment is granted with respect to Rueda's Title VII and

NYSHRL retaliatory hostile work environment claims.

### 1. Applicable Law

To survive summary judgment on a claim of retaliatory hostile work environment

asserted under Title VII or NYSHRL, a plaintiff must satisfy the same standard that governs

hostile workplace claims. *See Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015);

*see also Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001), *as amended* (Apr. 20, 2001) ("[W]e

apply the same standards in determining whether *retaliatory* harassment constitutes an adverse

employment action as we do in assessing whether harassment *imposed because of sex* works an

actionable alteration in the terms or conditions of employment."). Accordingly, plaintiff must

produce evidence demonstrating that the incidents of retaliation following the protected activity

were sufficiently severe or pervasive to have altered the conditions of her employment. *See*

A*ulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009). "Whether the

challenged conduct is sufficiently severe or pervasive 'depends on the totality of the

circumstances,'" *id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000),

*superseded on other grounds*), and "isolated instances of harassment ordinarily do not rise to this level," *Cruz*, 202 F.3d at 570. Although hostility of a work environment is assessed considering the "totality of the circumstances," *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007), "[i]t is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination," *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Where the hostile work environment claim is based on acts by "two different people during two different periods of time," the district court should "discount[ ] from its analysis, if not altogether disregard[ ], the intervening period" where plaintiff does not allege any retaliatory acts. *Aulicino v. N.Y.C. Dep't Homeless Svcs.*, 580 F.3d 73, 83, 84 (2d Cir. 2009) (vacating grant of summary judgment on plaintiff's hostile work environment claim and noting that inclusion of period of time devoid of allegations "dilute[d] the strength" of plaintiff's claim).

### 2. Application

Rueda claims that she "suffered actions that were 'continuous and concerted' from her discrimination grievance in 2003 until 2014 with baseless disciplinary charges." (Pl.'s Opp. 24.) Specifically, she claims that this hostile work environment "followed her to each unit and with each supervisor" throughout the entire eleven year period because "HRA top brass and all managers undisputedly knew about Rueda's complaints" and thus "her protected activity made her a target wherever she went." (*Id.*) In support of her retaliatory hostile work environment claims, Rueda points to the following nine incidents:

- Galarza denying Rueda's request for retroactive pay in 2003, (Pl.'s 56.1 ¶ 13);

- Galarza refusing to change Rueda's job title in 2006, (*id.* ¶ 25);

- Galarza requiring Rueda to return to a specific unit within IREA in December 2006, (*id.*);

- Rizzotti attempting to transfer Rueda to the Spousal Support Unit in September 2009, (*id.* ¶ 61);

- Rizzotti transferring Rueda to the Cash Assistance Unit by hand vote in May 2011, (*id.* 79);

- Adeosun assigning more cases to Rueda than other members of the Cash Assistance Unit in August 2011, (*id.* ¶ 109);

- Echevarria initially denying then approving Rueda's vacation request in January 2013, (*id.* ¶ 139);

- Rueda raising Echevarria's unethical conduct in April 2013, (*id.* ¶ 141);

- The filing of disciplinary charges against Rueda in April 2014, (*id.* ¶ 160).

These nine incidents, none of which is sufficiently severe on its own, span approximately eleven years; thus, Plaintiff's claims fail for lack of frequency when "considered cumulatively" from 2003 through 2014. *Aulicino*, 580 F.3d at 83; *Terry*, 336 F.3d at 148 ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quoting *Alfano*, 294 F.3d at 374)). However, that does not end the inquiry, because "there are different ways in which sets of hostile [incidents] might be considered 'cumulatively'" and I must draw all inferences in Rueda's favor. *Aulicino*, 580 F.3d at 83.

Here, Plaintiff's allegations, her own testimony, and numerous correspondence she drafted demonstrate significant periods of time during which she was not subjected to a hostile work environment. First, Plaintiff does not point to any evidence that suggests she experienced any acts of retaliatory hostility while she worked for Banks—from March 2004 until early 2006. To the contrary, Plaintiff testified that working for Banks was a positive experience. (Rueda Aff.

¶¶ 8–12;[19] Pl.'s 56.1 ¶¶ 20–23.)  Moreover, Rueda testified at her deposition that she "was always interested" in working on new projects for Mr. Banks, "because he was a great director." (Tr. Rueda Dep. 37:3-9.)  Second, Plaintiff does not point to any evidence that suggests she was subjected to a retaliatory hostile work environment during the two periods of time she worked under Ortiz's supervision:  (i) from November 2010 until May 2011, and (ii) from November 2011 until September 2012.  (Rueda Dep. Tr. 40:18-41:4; Pl.'s 56.1 ¶¶ 82, 121.)  Plaintiff repeatedly requested to be transferred to Ortiz's unit and stated that:  (i) she enjoyed working for Ortiz, (ii) the two have a healthy and productive professional relationship, and (iii) Ortiz appreciates her work ethic.  (*See, e.g.*, Rueda 5/27 Mem. to Rizzotti 3 ("Again, I emphasized that I have a productive and healthy relationship with Ms. Ortiz and that I prefer to remain in her unit."); Rueda 7/22 Email to Adeosun ("I am requesting again to be removed from Ms. Adeosun's supervision and to be reassigned to my former supervisor, Ms. Emerita Ortiz, with whom I had a healthy and productive professional relationship.  Ms. Ortiz . . . respects and appreciates my work ethic and experience.").)[20]

Consistent with *Aulicino* and to avoid "dilut[ing] the strength of [Rueda's] claims," I analyze the incidents in the light most favorable to Rueda and discount or disregard altogether the three time periods during which she does not claim to have experienced a hostile work environment.  *Aulicino*, 580 F.3d at 84.  Accordingly, I look to the following two periods during which Plaintiff claims to have been subject to a hostile work environment and analyze the incidents within each:  (1) from June until September 2011 when Rueda was assigned to the

---

[19] "Rueda Aff." refers to the Declaration of Paulina Rueda in Opposition to Defendant's Motion for Summary Judgment which is annexed as Exhibit 4 to the Maduegbuna Declaration.  (Doc. 141-4.)

[20] "Rueda 5/27 Mem. to Rizzotti" refers to Rueda's Memorandum to Rizzotti, dated May 27, 2011.  (Doc. 136-39 at PAR674.)  "Rueda 6/22 Email to Adeosun" refers to Rueda's email to Adeosun, dated July 22, 2011.  (Doc. 136-39 at PAR703.)

Cash Assistance Unit under Adeosun, and (2) from October 2012 through 2014, when Rueda was assigned to the Fair Hearing Unit under Echevarria.

From June until September 2011, Plaintiff worked in the Cash Assistance Unit under the supervision of Adeosun. (Pl.'s 56.1 ¶ 85.) The parties do not dispute that Rueda's time in the Cash Assistance Unit was contentious. (*Id*. ¶ 86; Def.'s Mem. 21.) During this time, Plaintiff frequently reiterated her belief that she was being subjected to a hostile work environment. (*See, e.g.*, Rueda's July 18, 2011 Ltr. to Sherman 1 ("I am currently working in a hostile work environment under Ms. Bolanle Adeosun's supervision.")). Rueda, however, acknowledges that she has no basis for believing that the allegedly hostile work environment in the Cash Assistance Unit arose in retaliation for her protected activity. (Pl.'s 56.1 ¶¶ 87–88.) Moreover, Rueda's testimony at her deposition emphasizes that she did not consider the hostile work environment in the Cash Assistance Unit as retaliation for her protected activity:

> Q: Okay But you believe that [Adeosun] was creating a hostile work environment because you engaged in filing an EEOC complain; is that correct?
>
> A: Well, I don't know that she knew about it; she was just creating this hostile work environment for me.
>
> Q: Why was she creating it?
>
> A: (Indicating) I don't know. I'm sorry, I am just gesturing I don't know.

(Tr. Rueda Dep. 123:12-15.) Assuming there was a hostile work environment in the Cash Assistance Unit, Rueda's prima facie claim still fails with respect to this period because she has not established and acknowledges that there is no "linkage or correlation" between her protected activity and the hostile work environment. *Alfano*, 294 F.3d at 377.

Rueda's claim for retaliatory hostile work environment also fails with respect to the period of time when she was assigned to the Fair Hearing Unit under Echevarria's supervision.

As discussed at length above, Rueda has not produced any evidence demonstrating "linkage or correlation," *id.*, between her protected activity and the incidents attributable to Echevarria. In addition, the claim also fails because incidents during this period are not sufficiently severe or pervasive. *See Porter v. Donahoe*, 962 F. Supp. 2d 491, 497 (E.D.N.Y. 2013) (granting summary judgment in favor of defendant where the "employment relationship between the parties [was] no doubt dysfunctional, but . . . [did] not rise to the daily or severe harassment that the law requires for a hostile work environment claim").

When the evidence is viewed together in its entirety and drawing all reasonable inferences in Rueda's favor, Plaintiff's claims for retaliatory hostile work environment fail because the challenged incidents were not (i) sufficiently continuous and pervasive enough, and (ii) linked to Rueda's protected activity. Accordingly, the City's motion for summary judgment is granted with respect to Plaintiff's Title VII and NYSHRL retaliatory hostile work environment claims.

### F.    *Rueda's NYCHRL Retaliatory Hostile Work Environment Claims*

"To support a retaliatory hostile work environment claim [under the NYCHRL], the actions complained of must be sufficiently severe or pervasive to constitute actionable harassment and stem from a retaliatory animus." *Clauberg v. State*, 943 N.Y.S.2d 653, 656–57 (2d Dep't 2012). For the reasons stated above, the incidents giving rise to Rueda's NYCHRL retaliatory hostile work environment claims are not "sufficiently severe or pervasive" and do not "stem from a retaliatory animus." *Id*. Accordingly, the City's motion to dismiss is granted with respect to Rueda's NYCHRL retaliatory hostile work environment claims.

### V.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is DENIED with

regard to Plaintiff's First and Second Causes of Action and GRANTED with respect to Plaintiff's Third and Fourth Causes of Action. The Clerks' Office is respectfully directed to close the pending motion at Document 133.

The parties are directed to appear for a post-discovery conference on October 11, 2017 at 12:00 p.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The parties are further directed to submit a joint letter on or before October 4, 2017, setting forth proposed trial dates and anticipated length of trial.

SO ORDERED.

Dated: September 21, 2017
      New York, New York

Vernon S. Broderick
United States District Judge